# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

PAULA C.,

      Plaintiff,

v.                               CIVIL ACTION NO. 2:23-cv-00659

MARTIN J. O'MALLEY
Commissioner of Social Security,[1]

      Defendant.


## PROPOSED FINDINGS & RECOMMENDATION


      Plaintiff Paula C. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 2). Presently pending before this Court are Claimant's Brief in Support of Complaint (ECF No. 5), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 8). Having fully considered the record and the arguments of the parties, the undersigned

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023, and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision, **GRANT** the Commissioner's request to affirm his decision, **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's active docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 57 years old at the time of her alleged disability onset date and 60 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 223).[2] Claimant has a high school education, and her work history includes a position as an insurance clerk. (Tr. 24-25, 243). In her application for benefits, Claimant alleges that she became disabled on October 16, 2019, due to bipolar disorder, insomnia, depression, anxiety, fatty liver, pre-diabetes, osteoarthritis, sciatica, edema, acid reflux, and Epstein Barr virus. (Tr. 223, 242).

Claimant filed her application for benefits on February 15, 2021. (Tr. 11, 223-26). The claim was denied initially on September 13, 2021, and again upon reconsideration on February 17, 2022. (Tr. 100, 111). On March 23, 2022, Claimant submitted a written request for an administrative hearing, which was held before an ALJ on October 20, 2022. (Tr. 81-99). Claimant was represented by counsel at the hearing, where she and a vocational expert each testified. (Tr. 81-99). On January 26, 2023, the ALJ entered an unfavorable decision. (Tr. 8-25). Claimant then sought review of the ALJ's decision by the Appeals Council on March 8, 2023. (Tr. 213-15). The Appeals Council denied Claimant's

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 4.

request for review on August 10, 2023, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-6).

Claimant timely brought the present action on October 6, 2023, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed a transcript of the administrative proceedings on November 29, 2023. (ECF No. 4). Claimant filed her Brief in Support of Complaint (ECF No. 5) on December 22, 2023, and in response the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 8) on February 21, 2024. Finally, Claimant filed a Reply Brief (ECF No. 9) on March 6, 2024. Each of the parties' filings were timely; now, having been briefed in full, this matter is ripe for adjudication.

### B. Relevant Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions[3] here for the convenience of the United States District Judge.

#### 1. Testimony

As part of her disability application, Claimant completed an Adult Function Report describing her subjective symptoms. (Tr. 280-87). Therein, she stated her physical impairments prevented her from bending, kneeling, or "being on her feet all day," and that her mental impairments made it difficult for her to concentrate. (Tr. 280). Additionally, Claimant reported that she is able to engage in activities such as cooking, shopping, and driving, as well as doing chores such as light housework, laundry, and ironing; further, Claimant stated she was able to perform her own personal care with no

---

[3] Claimant does not dispute the accuracy of the ALJ's recitation of the relevant medical evidence. (ECF No. 5 at 1).

difficulty, and could manage her own finances. (Tr. 281-84). Additionally, Claimant stated that her hobbies included sewing and playing games on her phone, and she reported being able to follow instructions and being fine with change. *See id.* She reported problems with lifting, stair climbing, squatting, bending, kneeling, memory, completing tasks, and concentration. *Id.*

During the administrative hearing, the claimant testified she worked as a medical biller. She stated her depression had worsened since her application, as she could not concentrate, she had trouble with speech and memory, and she sometimes would forget to take her medication. (*See* Tr. 81-94). Further, Claimant testified she does not sleep well and that she takes a one-to-two-hour nap four times a week but does not feel rested. *See id.* She estimated that she can sit or stand for a duration of 20 to 30 minutes, can walk a distance of approximately 600 feet, and can carry weight up to 20 pounds. *Id.* Claimant testified that generally she spends her day doing light housework and laundry. *Id.* Finally, Claimant testified that she cannot handwrite long because of problems with her hands. She has problems with her left knee especially when she goes upstairs. She has problems bending and cannot get on her knees.

Following Claimant's testimony, Vocational Expert ("VE") Enjouli McGoogan testified at the administrative hearing. (Tr. 94-99). The VE categorized Claimant's prior insurance-clerk position as sedentary, skilled work. (Tr. 96). The ALJ then posed a hypothetical scenario to the VE including the following limitations:

> [The] individual would be capable of performing work at the sedentary exertional level, as defined under the Regulations, with the following limitations. The individual could occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. Could occasionally balance, stoop, kneel, crouch, and crawl. The individual would be capable of tolerating occasional exposure to extreme cold, heat, vibration, atmospheric

conditions . . . and any workplace hazards such as moving machinery or unprotected heights.

(Tr. 97). The VE responded that the hypothetical individual in this scenario would be capable of performing Claimant's past work. (Tr. 97). The ALJ then asked the VE whether an addition to the hypothetical requiring only simple, routine tasks would affect the ability to do Claimant's past work, and the VE replied that such an individual would not be able to perform Claimant's past work. (Tr. 97). The ALJ also asked the VE what percentage of off-task time would be tolerated by employers, and the VE replied that anything greater than 10% would preclude full-time employment. (Tr. 98).

### 2. *Medical Records*

Claimant's relevant medical records begin in August 2019, when an MRI of the thoracic spine at Roane General Hospital showed a large disc protrusion or extrusion at T9-T10 with moderate narrowing of the central canal and moderate mass effect on the cord. (Tr. 598-926). The following month on September 17, 2019, the claimant was seen again at Roane General Hospital for chronic left lumbar radiculopathy and edema of both lower extremities (Tr. 598-926). Subsequently on September 30, 2019, Claimant called her primary-care provider to report depression, feeling anxious, and panic attacks she attributed to her job. (Tr. 491-566). She stated she put in her two weeks' notice and now wants a work note to cover those two weeks. *Id.*

On October 14, 2019, the claimant was seen at Roane General Hospital for an earache and headache. (Tr. 598-926). Her depression screening was negative and she presented as cooperative, alert, oriented, and in no acute distress. *Id.* On October 16, 2019, the claimant underwent a nuclear medicine thyroid uptake examination, and hypothyroidism was noted on testing *Id.*

On November 20, 2019, the claimant presented to at Roane General Hospital complaining of osteoarthritis in her back and knees and stated she has been seen by pain management and orthopedics. *Id.* She requested a hydrotherapy referral and stated that injections had helped her back previously. *Id.* Treatment notes state that Claimant was cooperative and comfortable with no edema and grossly normal mental status exam findings. *Id.* Diagnoses included left lumbar radiculopathy, generalized osteoarthritis, and polyosteoarthritis. *Id.* Later that week on November 26, 2019, the claimant was treated for a sore throat and viral upper respiratory infection. *Id.* On December 12, 2019, the claimant returned with complaints of a cough with blood tinged sputum. *Id.* Her depression screening remained negative, and examination findings remained normal. *Id.* On February 12, 2020, the claimant was seen again at Roane General Hospital for dizziness, ear pain, and congestion. *Id.* She was noted to be in no acute distress and was diagnosed with dysfunction of both eustachian tubes. *Id.*

On March 4, 2020, Claimant was seen by West Virginia Medicine where she reported doing better now that she is no longer working. (Tr. 491-566). Further, Claimant reported she was cleaning the house and sewing and that she made two quilts. *Id.* Treatment notes show that her mood was good, and she was oriented and cooperative with good eye contact and fair insight and judgment. *Id.*

On June 9, 2020, claimant was seen at Clendenin Family Medicine Primary care for back and feet pain. (Tr. 428-490). She stated her sciatic nerve was not bothering her any further, but that it hurt to be on her feet. *Id.* Exam findings note she was in no acute distress, and she had normal mood, memory, strength, and tone. *Id.* Her insight was noted to be good, and diagnoses included prediabetes and gastro-intestinal-reflux disorder ("GERD"). *Id.* Claimant returned on June 23, 2020, with complaints of a rash

and tick bite. *Id.* She stated she was bitten while working outside. *Id.* Exam findings note she was ambulating normally and in no acute distress, and there was a bullseye tick mark on her back. *Id.* She had normal mental status exam findings including normal mood, affect, and memory. *Id.* On August 5, 2020, the claimant returned to Clendenin reporting the new onset of right-knee and shin pain. *Id.* On examination, she exhibited tenderness over the right knee and was diagnosed with patella femoral stress syndrome. *Id.* Subsequently on August 10, 2020, the claimant was diagnosed with herpes zoster. *Id.*

On September 9, 2020, claimant presented to West Virginia Medicine, where her mood was noted to be stable, or "euthymic." (Tr. 491-566). Her diagnosis was major depressive disorder. *Id.*

On September 10, 2020, the claimant was seen at Roane General Hospital for right ankle pain and right leg pain. (Tr. 598-926). She had patella pain that was worse with ambulation; however, she was able to ambulate normally. *Id.* Exam findings note knee tenderness and severe obesity. *Id.* Diagnoses include pain in the right knee, pain in the right ankle, prediabetes, and peripheral edema. *Id.* Imaging taken that day showed minimal degenerative changes in the right knee, as well as plantar and posterior calcaneal spurs in the feet; however, there was no acute bony abnormality and no evidence of deep vein thrombosis in the right lower extremity despite the presence of edema. *Id.*

On October 29, 2020, the claimant requested to be tested for mold. (Tr. 428-490). She reported having headaches twice a week and stated he feels bad all the time. *Id.* She reported sleeping a lot and having no energy. *Id.* Examination notes indicated morbid obesity and tenderness at the medial side of the tibial plateau. *Id.* Diagnoses included dysuria, chronic rhinitis, chronic fatigue syndrome, and peripheral edema. *Id.*

On December 9, 2020, the claimant was seen by her chiropractor at McCarter Wellness for a monthly check-up on her complaints of fatigue, malaise, weight gain, toxicity, irritable bowel syndrome, non-alcoholic steatohepatitis, and fatty-liver disease. (Tr. 951). Treatment notes state that the claimant "wants to go back to work." (Tr. 951-61). The treatment plan called for additional diagnostic testing, as well as orders for a healthful diet and home exercise. (Tr. 952).

On January 12, 2021, Claimant presented to Charleston Area Medical Center Gastroenterology with complaints of abdominal fullness and discomfort with mild pain under her rib, as well as constipation and large stools. (Tr. 1345). She had normal physical and mental exam findings and a negative depression screening. *Id.* Diagnoses include colon polyps, family history of colon cancer, irritable bowel syndrome, and abdominal pain likely related to constipation. (Tr. 1346).

On February 25, 2021, the claimant was seen for left foot and ankle pain, with recent onset. (Tr. 428-90). She was ambulating normally and had normal tone, strength, and mental status exam findings. *Id.* There was tenderness at the medial tibial plateau with no joint effusion. *Id.*

On April 5, 2021, the claimant was seen at Mountain State Rheumatology for an evaluation of rheumatoid arthritis. (Tr. 1018-38). She reported morning stiffness and pain in the right knee and lumbar spine joints; however, she is independent in her activities of daily living. *Id.* Imaging showed osteoarthritic changes in her knee and lumbar region. *Id.* Exam findings note she was in no acute distress with normal range of motion and gait and tenderness in the right knee. *Id.* Diagnoses included doubtful rheumatoid arthritis involving multiple sites with positive rheumatoid factor, osteoarthritis in the lumbar spine, and chronic pain of the right knee. *Id.*

8

On March 10, 2021, claimant presented to West Virginia Medicine, where treatment records note she reported sleeping more than she would like and being unable to sit for a long duration. (Tr. 491-566).  She stated her mood was okay and she thinks the medications are working. *Id*. Mental status exam findings were normal. *Id*.

On May 6, 2021, the claimant returned to her chiropractor at McCarter Wellness, where she reported intermittent bilateral lower lumbar pain and exhibited guarding, spasm, and tenderness in the hip and pelvis (Tr. 951-61). She had full range of motion. *Id*.

On June 2, 2021, the claimant was seen for osteoarthritis in the lumbar spine without radiation. (Tr. 598-926). She exhibited pain with range of motion in the neck and lumbar and had negative straight leg raise testing. *Id*. Diagnoses included a Vitamin D deficiency, spondylosis without myelopathy, and rotator cuff tendinitis. *Id*.  On August 3, 2021, MRI imaging showed L3-L4 bilateral facet arthropathy and shallow broad based disc displacement, L4-L5 non-compressive disc protrusion, and L5-S1 left paracentral preforaminal disc protrusion. *Id*. On June 17, 2021, the claimant was seen at Mountain State Rheumatology where she reported right knee pain and back pain. (Tr. 1018-38).  She continued to report being independent in her activities of daily living and had normal gait and range of motion. *Id*.

On July 1, 2021, the claimant presented to her primary-care physician at Clendenin Family Medicine with complaints of back pain and diarrhea. (Tr. 962-94). Treatment records indicate morbid obesity and note that Claimant was ambulating normally, with normal tone and strength. *Id*. Mental status exam findings remained normal and diagnoses include GERD, prediabetes, allergies, postmenopausal state, chronic back pain, and hypothyroidism. *Id*.

On July 27, 2021, Claimant was seen at Charleston Area Medical Center Gastroenterology for a six-month follow-up appointment regarding her irritable bowel syndrome and fatty liver. (Tr. 1157-61). She reported no concerns and explained that the diarrhea stopped when she stopped taking Metformin. (Tr. 1162).

On August 3, 2021, an MRI of the lumbar spine showed L3-L4 bilateral facet arthropathy and shallow broad based disc displacement, L4-L5 noncompressive disc protrusion, and L5-S1 left paracentral preforaminal disc protrusion. (Tr. 260, 261).

On August 11, 2021, the claimant underwent an MRI and consultative examination (Tr. 927-30; 931-36). MRI imaging showed mild degenerative disc changes at L3-L4, L4-L5, and L5-S1, with trace grade 1 anterolisthesis at L3-L4. (Tr. 927-30). The consultative examiner's report notes the claimant's chief complaints were low back pain, osteoarthritis everywhere, and prediabetes. *Id*. Exam findings note her posture was straight and her gait was normal. *Id*. Further exam findings indicated that the claimant was morbidly obese with no atrophy, and that she had normal sensation and reflexes, normal gait, and normal gait, grip strength, and fine manipulation. (Tr. 931-36). She also had normal range of motion with the exception of lumbar flexion, and was noted to be able to get on and off the table independently. *Id*.

On August 16, 2021, the claimant was seen at West Virginia Neurology for low back pain that radiated into her buttocks bilaterally. (Tr. 937-50). Records note her symptoms were consistent with claudication; however, her vascular study was normal. *Id*. Her gait and station were antalgic, but her range of motion, strength, and sensation were normal. *Id*. Further, her cranial nerves were grossly intact. *Id*. Diagnoses included low back pain and degeneration of the lumbar intervertebral disc. *Id*.

On August 30, 2021, the claimant was seen at Mountain State Rheumatology; treatment notes state that claimant reported taking Tylenol for her pain. (Tr. 102). She was in no acute distress with normal mood and affect, intact judgement and insight, normal range of motion, and tenderness in her right hand. (Tr. 103-04). Imaging from the same date reflected mild degenerative changes with some mild joint space narrowing and subchondral sclerosis. (Tr. 105).

On October 6. 2021, the claimant was seen at West Virginia Medicine for a medication check. (Tr. 995-1001). She reported dizzy spells and having an appointment to see her primary care provider in December 2021. *Id.* Her mood was euthymic and she had good eye contact and fair insight and judgment. *Id.* Subsequently on October 26, 2021, the claimant was seen at Mountain State Rheumatology; she reported taking Tylenol and Aleve, but her pain was not adequately controlled. (Tr. 1760). Further, Claimant reported mild morning stiffness; however, she also reported that she remained independent in her activities of daily living. *Id.* Exam findings noted bilateral wrist and finger tenderness, intact sensation, right knee tenderness, and pain on axial compression bilaterally; however, gait remained normal. (Tr. 1762). Diagnoses included inflammatory arthritis, osteoarthritis in both hands, and osteoarthritis in the lumbar spine. (Tr. 1762-63). The claimant was given an injection in her right knee. (Tr. 1764).

On December 7, 2021, Claimant was seen at Charleston Area Medical Center Gastroenterology for a six-month follow up on her fatty-liver diagnosis. (Tr. 1142-1143). She reported a chief complaint of black stools and indigestion. (Tr. 1142). The treatment plan was to prescribe an antibiotic and order lab work; Claimant was directed to call in with any increase in symptoms. *Id.* On December 20, 2021, the claimant followed up at Mountain State Rheumatology; treatment notes show claimant had normal mood, range

of motion, and sensation. (Tr. 1018-38). Her gait remained normal despite pain on axial compression. (Tr. 1727). On December 22, 2021, the claimant was seen in follow up for reflux, GERD, fatigue, and morbid obesity (Tr. 962-94). Exam findings continue to show normal strength and tone, no contractures, malalignment, or tenderness, and normal movement of all extremities. *Id.* Diagnoses included persistent insomnia, GERD, and prediabetes. *Id.*

On January 19, 2022, the claimant was seen for low back pain and covid-19 testing. (Tr. 1390-1415). The following week on January 28, 2022, the claimant reported her covid-19 symptoms improved except for a lingering cough. *Id.*

On March 23, 2022, the claimant was seen at Mountain State Rheumatology; she reported her medication helps with osteoarthritis and that her disease was reasonably controlled. (Tr. 1715). She continued to remain independent in her activities of daily living. *Id.* Mood, range of motion, sensation, and gait were all noted to be normal (Tr. 1717-18).

Subsequently on March 29, 2022, the claimant was diagnosed with a pancreatic cyst seen on imaging; ultimately, however, the biopsy results were negative. (Tr. 1807, 1812, 1814).

On April 13, 2022, the claimant was seen at West Virginia Medicine; she reported struggles with sleep and racing thoughts. (Tr. 491-566). She stated she has no energy, but her mood is not depressed. *Id.* Treatment notes state that Claimant's mood was apathetic, but that her exam findings were otherwise normal. *Id.*

On April 21, 2022, the claimant was seen at Foot & Ankle Center; there, she was diagnosed with capsulitis of the toe and neuroma of the foot. (Tr. 1360-64). Claimant had

pain at the second metatarsal head and interspace pain at the second digit, and was given an injection to help relieve her symptoms. *Id.*

On June 7, 2022, treatment notes show Claimant's reported symptoms were worse, but she remained independent in her activities of daily living. (Tr. 1367-87). She reported increased pain and swelling in the second, third, and fourth digits. *Id.* On examination, Claimant showed tenderness and swelling in the right hand and bilateral hips; however, strength was noted to be 5/5, with a normal gait. *Id.* Diagnoses included inflammatory arthritis, osteoarthritis in both hands, spondylosis in the lumbar spine, calcaneal spurs in the bilateral feet, right leg pain, trochanteric bursitis in both hips, primary osteoarthritis in both knees, and sprain of the right hand. *Id.*

Finally, on September 7, 2022, the claimant reported low back pain to her primary-care provider at Clendenin Health Center. (Tr. 1390-1415). Additionally, Claimant reported that her right-leg pain had resolved, and she was taking muscle relaxers and steroids. *Id.* On examination, she was noted to be ambulating normally and had normal strength, tone, and movement of all extremities. *Id.*

### 3. *Prior Administrative Findings*

In September 2021, Isidro Amigo, M.D., a State-agency medical consultant, found from a review of the medial records that Claimant had a number of severe physical impairments, including chronic-fatigue syndrome. (Tr. 105). Dr. Amigo found that Claimant would be able to occasionally lift up to twenty pounds and frequently lift up to ten pounds; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; could never climb ladders/ropes/scaffolds, and could occasionally engage in all other postural activities; should avoid concentrated exposure to most hazards; and had no manipulative limitations. (Tr. 107-08). On reconsideration,

State agency physician Lisa Venkataraman, M.D., affirmed Dr. Amigo's findings as written. (Tr. 117-18).

Regarding Claimant's mental-health impairments, State-agency psychological consultant Karl G. Hursey, Ph.D., found that Claimant had no limitations in all four "paragraph B" criteria; Dr. Hursey concluded that—because Claimant reported that her medications were working well, that her mood and anxiety were well-controlled, and that she expected to go back to work in the next year—the medical record "does not indicate severe functional limitations" related to Claimant's mental impairments. (Tr. 105-06). On reconsideration, State-agency psychological consultant James Capage, Ph.D., noted that Claimant reported an increase in her symptoms of depression since Dr. Hursey's initial-level evaluation. However, Dr. Capage found this new information was "not significant enough to change the initial determination," and thus adopted Dr. Hursey's findings as written. (Tr. 115).

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"—in other words, if no finding is made at a certain step, the ALJ's analysis advances on to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability

lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015). Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v.*

*Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ

must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659. After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through September 30, 2024—the date last insured—and thus qualified to apply for DIB benefits. (Tr. 13). Turning to the first step of the sequential evaluation process, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. *Id.* Next, at step two, the ALJ determined that the following of Claimant's conditions constituted "severe" impairments: osteoarthritis; bursitis; degenerative-disc

disease of the lumbar spine; radiculopathy; spondylosis; chronic-liver disease; obesity; capsulitis of the toe; neuroma of the foot; and calcaneal spurs. *Id*. However, the ALJ found at step three that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). Next, upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform sedentary work," subject to the following limitations:

> [C]laimant can occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She is capable of tolerating occasional exposure to extreme cold, heat, vibration, atmospheric conditions . . . and any workplace hazards such as moving machinery or unprotected heights.

(Tr. 18).

Finally, at the last step of the sequential evaluation process, the ALJ enlisted a Vocational Expert ("VE") to aid in her findings. (Tr. 24). The ALJ found that Claimant "is able to perform . . . [and] can return to . . . her past relevant work" as an insurance clerk— a sedentary, skilled position—because it "does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. 24-25). Based upon this finding, the ALJ determined that Claimant "has not been under a disability" during the relevant time period. (Tr. 25).

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it

must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

In support of this § 405(g) action, Claimant makes three assertions of error. First, Claimant argues that the ALJ's written determination regarding Claimant's Residual Functional Capacity ("RFC") is deficient as a matter of law because "the ALJ failed to accommodate [Claimant's] proven mild mental limitations or explain why they were omitted from the ALJ's RFC assessment." (ECF No. 5 at 2). As to Claimant's second and third assertions of error, she argues that remand is required because the ALJ's RFC determination failed to properly consider the impact caused by Claimant's fatigue and bilateral-hand arthritis, respectively. *Id.*

In response, the Commissioner argues that the ALJ did not err and that her decision is supported by substantial evidence. He points out that the ALJ's decision in this case is thorough and well-supported, particularly considering the volume of medical evidence in the record—which spans more than 1,000 pages in total. (*See* ECF Nos. 4; 4-1). The Commissioner further argues that the Claimant's arguments lack merit because

they each ignore the ALJ's extensive discussion of each of these conditions and the basis for her determination that Claimant's fatigue and bilateral-hand arthritis did not impact Claimant's RFC. (*See* ECF No. 8).

In her reply brief, the Claimant reiterates her first argument that the ALJ specifically found the Claimant had "mild" limitations in all four broad areas of mental functioning, but failed to explain why she did not incorporate these mild limitations into Claimant's RFC. (ECF No. 9 at 1-3). Second, Claimant argues that the ALJ relied improperly upon her own lay judgment and ignored medical opinions and other evidence that Claimant's fatigue would significantly impact her ability to perform her past skilled work. *Id.* at 3-4. Lastly, Claimant reiterates that the ALJ made no actual finding regarding the severity or non-severity of Claimant's bilateral-hand impairment, leaving it unclear whether she considered any work-related limitations. (ECF No. 9 at 4).

Having reviewed the parties' submissions as well as the transcript of administrative proceedings (the "record"), herein the undersigned takes up each of Claimant's three assertions of error in turn.

### A. Impact of Claimant's Mild Mental-Health Limitations on Her RFC

In support of her first assertion of error, Claimant points to the ALJ's finding that the medically-determinable impairment of depression caused mild limitations in all four domains of mental functioning (i.e., understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself). (ECF No. 5 at 4 (citing Tr. 14-15)). Claimant highlights that the ALJ's finding is more favorable to her than the opinions of the state-agency physicians, who found Claimant had *no* mental-function limitations. (ECF No. 5 at 4 (citing Tr. 14-15, 105, 115)). Claimant does not challenge the ALJ's determination that her

mental-function limitations were mild; as she explains in her brief, her assertion of error "has nothing to do with how the ALJ weighed the medical evidence or what medical opinions and other facts were considered." (ECF No. 5 at 4 n.2). Instead, according to Claimant, "the issue is solely whether it was legal error for the ALJ to omit Claimant's proven mental functional limitations from the RFC finding without explanation." *Id.* Specifically, Claimant argues that "the ALJ here included precisely zero mental functional limitations in her RFC finding and dispositive hypothetical question to the VE (Tr. 18, 97)," despite the ALJ's prior finding of credible mild limitations at steps two and three of the sequential evaluation process. (ECF No. 5 at 5-6).

Claimant concedes that, "[w]ith respect to the ability to perform unskilled work, any omission of mild mental functional limitations may likely constitute harmless error." *Id.* at 6-11. However, Claimant distinguishes the circumstances *sub judice* based upon the ALJ's determination that the Claimant can perform prior *skilled* work. *Id.* at 11 (citing Tr. 18-23). Based upon these factors, Claimant concludes that the ALJ's written decision is "facially defective" because the ALJ fails therein to explain why the mild mental limitations were omitted from the discussion of her RFC determination, and fails to otherwise identify how Claimant's mild mental-function limitations impact her ability to perform her skilled prior work. *Id.* According to Claimant, this "facial deficiency" violates Agency policy and warrants remand. *Id.* at 11-13 (citing SSR 96-8p, 1996 WL 374184, *4).

In response, the Commissioner argues that the ALJ did not err because she thoroughly explained why Claimant's mild mental impairments did not require any work-related limitations. (ECF No. 8 at 8). Unlike the cases Claimant cites, the ALJ here discussed Claimant's mental impairments many times throughout her decision—not only at step two of the sequential evaluation process, but also during her RFC assessment. *See*

*id.* According to the Commissioner, the ALJ's extensive discussion demonstrates her adequate consideration of Claimant's mild mental impairments and her reasoning for not adding limitations related to those impairments in her RFC. *Id.*

In support, the Commissioner highlights the ALJ's explanation that, although Claimant sometimes reported feelings of anxiety and depression and trouble concentrating, Claimant's mental-status examinations consistently showed normal memory, cooperative attitude, good eye contact, normal attention, normal thought content, and "fair if not better" insight and judgment. *Id.* (citing Tr. 14-15, 462, 495, 819, 967, 974, 998-99, 1120-21). Furthermore, the ALJ points to Claimant's own statements that she engaged in a number of daily-living activities requiring relatively-unimpaired mental functioning and concentration, such as playing games on her phone, sewing, preparing meals, shopping, doing chores, handling her own finances, managing personal care, and spending time with others. *Id.* (citing Tr. 14-15, 281-84). The Commissioner further points out that the ALJ expressly stated in her written decision that her RFC assessment "reflects the degree of limitation . . . found in the 'paragraph B' mental function analysis." (Tr. 19). More significant, the Commissioner explained that—unlike the caselaw relied upon by Claimant's brief—the ALJ did not merely confine her analysis of Claimant's mental-function limitations to step two of the sequential-evaluation process. (ECF No. 8 at 9-10).

On review, the undersigned **FINDS** that—contrary to Claimant's assertions—the ALJ expressly explained the logical and evidentiary basis for her finding that Claimant's mild mental-function limitations did not impact her ability to perform her skilled prior work, and that the ALJ included this explanation in the portion of the written decision where she discusses her RFC analysis. The ALJ specifically included a detailed

explanation demonstrating the evidentiary basis and rationale she employed in her evaluation of "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." *Id.* The ALJ expressly acknowledged Claimant's own reports of memory and concentration problems, and explained the basis for her determination that those limitations did not "limit the [Claimant's] ability to do work-related activities." (Tr. 18). She expressly evaluated the Claimant's allegations and testimony—including Claimant's allegations of disability based upon "bipolar disorder, insomnia, depression, [and] anxiety," and pointed to specific evidence she weighed against these statements to support her finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 18-19). For instance, the ALJ noted that the Claimant reported memory and concentration problems, but she explained that the medical records demonstrate that, overall, Claimant had consistently normal mental-status-exam findings. (Tr. 19-23 (citing 462, 495, 819, 967, 974, 998-99, 1120-21)).

Following her discussion of this medical evidence the ALJ summarized that the "[m]ental health treatment records note the claimant reports her medication is effective and that she denies symptoms of depression or anxiety when compliant . . . [and] [f]urther, the claimant had multiple depression screenings when seen by her providers and her mental status exam findings are normal." (Tr. 23). The ALJ concluded that, "[o]verall, the evidence of record does not support the alleged loss of functioning[,] [but rather] shows that the claimant's allegations of disabling impairments, which are found in the claimant's disability reports and hearing testimony, are inconsistent with objective

findings and subjective findings on examinations as well as her activities of daily living." (Tr. 23).

Next, the ALJ's RFC assessment discussed the opinions of the psychological consultants and explained why she found those opinions to be persuasive. (Tr. 23-24). As the ALJ explained, "[t]he consultants opined the claimant has only non-severe mental impairments and no functional limitations." (Tr. 24).  She found that the opinions were "consistent with the evidence of record that notes normal mental status exam findings including normal memory, attention, and behavior, a generally euthymic mood, and fair insight and judgment." *Id.* The ALJ also found it significant that Claimant "has consistently reported she is independent in her activities of daily living."  Likewise, the ALJ specifically discussed mental-health-treatment records from West Virginia University Medicine where Claimant reported that her depression and anxiety improved after she quit her job; in fact, Claimant reported that her mood was good and her medications were working. (Tr. 22-23, 495, 497-98). Based upon this evidence, the ALJ concluded that the record evidence "*does not support [Claimant's] alleged loss of functioning*," because the "[m]ental health treatment records note [Claimant] reports *her medication is effective* and that she denies symptoms of depression or anxiety *when compliant*" with her prescribed course of medication. (Tr. 23) (emphasis added).

The undersigned agrees with the Commissioner's characterization that the instant action "is not a case where the ALJ failed to discuss Claimant's  mental impairments beyond step two," because the ALJ's analysis "very clearly allows for meaningful review of the ALJ's determination that Claimant did not have any mental RFC restrictions." (ECF No. 8 at 10). The RFC analysis set forth in the ALJ's written decision thoroughly explained why she did not include a limitation for Claimant's mild mental-function impairments.

Consequently, the ALJ's RFC analysis is distinguishable from the caselaw cited by Claimant, all of which involved an ALJ's omission of a claimant's mental impairments from the RFC discussion entirely. *See Shank v. Saul*, 3:20-cv-00444, 2021 WL 2767063, at *8 (S.D. W. Va. June 11, 2021), *adopted*, 2021 WL 2744550, at *1 (July 1, 2021); *Jones v. Kijakazi*, 5:21-cv-00634, ECF No. 18 at 19 (S.D. W. Va. Sept. 22, 2022) ("[T]he ALJ did not discuss, or even mention, [c]laimant's mental limitations at any subsequent steps of the sequential evaluation."), *adopted*, ECF No. 19 (Nov. 28, 2022).

In her reply brief, the Claimant reiterates her assertion of error on the grounds that "the ALJ did not accept the state agency finding that [Claimant] had 'no' mental limitation in the four broad areas of mental functioning (Tr. 24, 105, 115) . . . and instead specifically found . . . 'mild' limitations in all four broad areas." (ECF No. 9 at 2 (citing Tr. 14-15)). Claimant asserts that "[t]his inconsistency and lack of explanation alone preclude any meaningful judicial review, requiring remand." *Id.* at 3. Claimant is correct in that the ALJ stated that "[t]he evidence of record supports finding the claimant has no more than mild limitations in any area of mental function and no severe mental impairments." (Tr. 24). Claimant's position, however, relies upon an overly-literal construction of the ALJ's statement and ignores the central theme of the RFC analysis, that—while finding no more than mild mental-health limitations—the ALJ did not include any work-related mental-function limitations in the RFC because the medical and state-agency opinion evidence demonstrated that Claimant's symptoms are resolved *when she is compliant with her regimen of medication*. Simply put, a fair reading of the written decision demonstrates that the ALJ provided an accurate and logical bridge between the evidence and her conclusions—quite distinct from the line of improper decisions which frustrated judicial

review by leaving the reader "to guess about how the ALJ arrived at [her] conclusions." *Mascio*, 780 F.3d at 637.

Based upon the foregoing, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence, and Claimant has failed to demonstrate error on this basis. Accordingly, the undersigned respectfully recommends that Claimant's request for remand be **DENIED**.

### B. *Impact of Claimant's Condition of Fatigue on Her RFC*

In her second assertion of error, Claimant argues the ALJ "committed legal error in considering [Claimant's] fatigue." (ECF No. 5 at 13-14). Specifically, Claimant argues that the ALJ—in finding that Claimant's chronic-fatigue syndrome is non-severe—improperly substituted her own lay judgment over the opinions of state-agency physicians Isidro Amigo, M.D., and Lisa Venkataraman, M.D., who found that Claimant has severe chronic-fatigue syndrome. (ECF No. 5 at 13-14). Claimant also argues that the ALJ "completely ignored [the] fatigue symptoms" after determining that Claimant's chronic-fatigue syndrome was non-severe. (ECF Nos. 5 at 13-14; 9 at 3; Tr. 105, 116). Claimant argues that the ALJ's failure to consider her fatigue is not harmless in light of the ALJ's finding that Claimant was able to return to her past skilled work. *See id.*

In response, the Commissioner argues that the ALJ appropriately evaluated the persuasiveness of the state-agency physicians' opinions under the express provisions of 20 C.F.R. § 404.1520c. (ECF No. 8 at 12-13) (citing 20 C.F.R. § 404.1520c(a). The ALJ determined that the physicians' opinions as to the severity of Claimant's chronic-fatigue syndrome were inconsistent with the record evidence as a whole, and she explained the evidentiary basis for this determination. (ECF No. 8 at 13-14) (citing Tr. 24, 105, 116)). The Commissioner concludes that, because the ALJ's written decision properly discusses

her evaluation of "the most important [persuasiveness] factors" of supportability and consistency, the decision complies with the requirements of § 104.1520c(a) and is therefore free of error. *See id.*

In reply, Claimant does not address the Commissioner's arguments; instead, she merely restates her argument that the ALJ improperly substituted her lay opinion to find that Claimant's chronic-fatigue syndrome was not severe, and then "completely ignored" Claimant's fatigue symptoms. (ECF No. 9 at 3-4).

Simply put, Claimant's argument lacks merit and fails to demonstrate error. First, it is plain that the ALJ's severity determination did not trespass into the territory of a medical opinion. It is undisputed that Claimant's chronic-fatigue syndrome was a medically-determinable impairment; in fact, the ALJ specifically found that the impairments at issue "could reasonably be expected to cause the alleged symptoms[.]" (Tr. 19). Rather than replacing the physicians' diagnosis with her own lay opinion, the ALJ appropriately considered the persuasiveness of the physicians' opinions regarding the *severity* of Claimant's impairment in light of the evidence from other medical sources, the objective medical evidence, and nonmedical sources in the claim. (*See* Tr. 19-20). In accordance with § 404.1520c(c)(1)-(2), the ALJ assessed the factors of supportability and consistency and explained the logical and evidentiary basis for her conclusion. (*See* Tr. 19-24). In particular, the ALJ explained that the opinions of Dr. Amigo and Dr. Venkataraman were inconsistent with the record evidence as a whole. *See id.* For instance, the ALJ noted that, in contrast to the physicians' opinions and Claimant's subjective complaints regarding the severity of her symptoms, a diagnosis of chronic-fatigue syndrome appears only once in a sea of medical records spanning more than a thousand pages. (Tr. 20, 438). The ALJ noted that this finding is equivocal, because the same record states that additional testing may be

required to identify other potential etiologies for Claimant's symptoms—including a medication or obstructive sleep apnea. *Id.* Furthermore, the ALJ points extensively to treatment records consistently indicating that Claimant's mental-status and physical examinations were normal and that Claimant reported being fully independent in her activities of daily living—including activities requiring sustained concentration like sewing, gaming, and cooking. (Tr. 20-24). Based upon this evidence, the ALJ appropriately determined that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 19).

Furthermore, Claimant's assertion that the ALJ ignored Claimant's other symptoms of fatigue "once she concluded that [Claimant's] chronic-fatigue syndrome did not rise to the level of a severe impairment," (*see* ECF No. 5 at 14), is inaccurate. It is undisputed that Claimant reported other fatigue-related symptoms, as recognized by the ALJ. (Tr. 23-24). The ALJ's extensive discussion of the medical records as well as her RFC discussion expressly acknowledge Claimant's reported struggles with sleep, racing thoughts, and lack of energy. (Tr. 20, 23). The ALJ explains that these reported symptoms are simply incongruous with the record as a whole; nonetheless, the ALJ accounted for Claimant's non-severe fatigue-related impairments in part by adding limitations consistent with a restriction to sedentary work into the RFC. (Tr. 23-24, 1416-1425). The ALJ's extensive discussion of the medical records demonstrates a traceable tether of logic between the evidence and the ALJ's conclusions, and the ALJ reasonably found, based on Claimant's generally normal exam findings and independent activities of daily living, that the record did not support Claimant's allegations. This is supported by substantial evidence.

Tellingly, Claimant's assertion of error is unsupported by any Fourth-Circuit authority, or other persuasive caselaw setting forth circumstances similar to the instant action; nor does Claimant's reply brief refute any of the Commissioner's counterarguments and supporting authority. Instead, Claimant merely states that "the record is replete with evidence of [Claimant's] fatigue  (Tr. 103, 114, 641-42, 653-54, 899-900, 951, 955, 967, 1308)." (ECF No. 5 at 14; *see also* ECF No. 9 at 3 (repeating the same)). Claimant fails to offer any meaningful discussion of the dozen or so listed numbers pulled from a record spanning 1,425 pages. (*See* ECF Nos. 4; 4-1). The only record addressed by Claimant's brief is a single treatment note from a May 6, 2021 chiropractic examination. (ECF Nos. 5 at 14; 9 at 3-4 (each citing Tr. 955)). According to the Claimant, therein her chiropractor "characterized [Claimant's] fatigue as 'daily debilitating fatigue.'" *Id.*

Notably, the treatment note at issue does not contain a medical opinion that the claimant has "daily debilitating fatigue," as Claimant's brief suggests. (ECF No. 5 at 14). Instead, the quoted language is pulled from the patient-history section of the chiropractor's treatment note, summarizing Claimant's report that she suffers from daily debilitating fatigue in addition to her reported symptoms of joint pain, malaise, depression, and progressive obesity, in addition to summarizing the list of the Claimant's current medications. (Tr. 955). In the treatment plan, the chiropractor recommends that Claimant seek a medical evaluation and additional diagnostic testing through her primary-care physician. (Tr. 956). The only reference to Claimant's fatigue in this section is the chiropractor's addition in the Comments section of the treatment plan to "Update exercise once fatigue is stabilized." *Id.* In short, Claimant failed to demonstrate that any of the medical records she cites in her brief support a finding that the ALJ's determination

improperly contravenes the medical evidence or that the ALJ otherwise committed legal error in considering Claimant's symptoms of fatigue.

Furthermore, Claimant's mere citation to record "evidence of [her] fatigue" fails to demonstrate error. By simply pointing to other evidence on the record that may support a different finding, Claimant is essentially asking the Court to *re-weigh* the evidence. This is improper because it is the province of the ALJ, and not this Court, to resolve conflicts in the evidence. *See, e.g.*, *Keene v. Berryhill*, 732 Fed. App'x 174, 177 (4th Cir. 2018) ("This court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. There were a number of conflicts in the evidence here, and we do not second guess the ALJ in resolving those conflicts."). As set forth *supra*, the Court's only role on review pursuant to 42 U.S.C. § 405(g) is to ensure the ALJ's decision is supported by substantial evidence, and free of legal error.

Ultimately, Claimant may disagree with the ALJ's determination that the record evidence does not support the *extent* of fatigue-related impairments alleged by the Claimant, but it is well-established that a claimant's mere disagreement with the inferences the ALJ made from the evidence, standing alone, is patently insufficient to demonstrate error. *See id.* The ALJ clearly explained why she did not find the State agency physicians' opinions regarding the severity of Claimant's impairments of chronic-fatigue syndrome and other fatigue-related symptoms were persuasive in light of the record evidence as a whole; the ALJ then grounded her explanation in support from the medical record, in a manner that is more than sufficient to trace the path of her reasoning. The undersigned **FINDS** that the ALJ appropriately considered Claimant's subjective complaints and the state-agency physicians' opinions under the appropriate regulatory framework, and

substantial evidence—more than a scintilla—supports the ALJ's fact-finding. While Claimant, and even the Court, may have reached a different determination, the ALJ's decision plainly met this standard. Accordingly, the undersigned respectfully recommends that Claimant's request for remand be **DENIED**.

### C. *Impact of Claimant's Bilateral-Hand Osteoarthritis on Her RFC*

Finally, Claimant argues that remand is required because the ALJ failed to appropriately consider Claimant's impairment of bilateral osteoarthritis of the hands and its impact upon the RFC. (ECF No. 5 at 15). Claimant highlights that x-ray images from August 2021 "confirm bilateral degenerative changes of the hands," and treatment records indicate that she has been diagnosed with osteoarthritis of both hands on at least three occasions. *Id.* (citing Tr. 1035, 1045, 1122, 1385). Claimant concedes that "the ALJ recognized this evidence in the narrative portion of the decision," but objects that the ALJ did not make an express finding specifically as to severity. *Id.* (citing Tr. 22). Claimant concludes that "[t]he ALJ's failure to articulate her reasons for omitting . . . hand limitations from her RFC renders this decision beyond judicial review . . . [because] it is impossible to know, on this record, how, or even if, the ALJ considered [Claimant's] work-related limitations related to her bilateral osteoarthritis of the hands[.]" *Id.* at 15-16.

In response, the Commissioner asserts that Claimant's argument is "demonstrably inaccurate." (ECF No. 8 at 15). The Commissioner points out that the ALJ's written decision specifically included osteoarthritis as one of Claimant's severe impairments, and specifically addresses Claimant's osteoarthritis in both hands in the RFC determination. *Id.* at 15-16 (citing Tr. 13). The Commissioner concludes that the ALJ's decision rests on application of proper legal standards and is supported by substantial evidence. *Id.* at 17. In her reply brief, Claimant challenges the Commissioner's argument

that the ALJ's finding of severe osteoarthritis encompassed a consideration of Claimant's "hand limitations." (ECF No. 9 at 4). Claimant acknowledges that the ALJ "mentioned [the] hand impairment in the narrative portion of the decision," but argues that, without a finding of severity, "[i]t is impossible to know, on this record, how, or even if, the ALJ considered [Claimant's] work-related limitations related to her bilateral osteoarthritis of the hands, requiring remand." *Id.*[4]

Upon review of the ALJ's thorough and well-supported written decision, Claimant's assertion of error is simply not borne out by the record. At step two of the sequential evaluation process, the ALJ expressly found "[t]he medical evidence of record reflects that the claimant has medical signs and objective findings establishing the diagnoses [of] osteoarthritis, and that Claimant's osteoarthritis constituted a "severe impairment[.]" (Tr. 13). Further, throughout the opinion, the ALJ expressly discusses the evidence regarding to Claimant's hand function in the context of her bilateral osteoarthritis. In the ALJ's narrative discussion, she describes how the medical evidence, including results from imaging and physical examinations reflected in Claimant's treatment records, do not support "finding the claimant . . . is unable to independently initiate, sustain, and complete work-related activities involving fine and gross movements." (Tr. 16). Specifically, in her assessment of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ explained that, in order to qualify for abnormality of a major joint in any extremity in accordance with Listing 1.18, Claimant must demonstrate the following:

---

[4] Claimant also argues in her initial and reply briefs that the Commissioner may not rely upon post-hoc rationalization to rehabilitate the ALJ's failure to explain her findings, and that the ALJ's purported error is not harmless because manipulation of the hands and fingers would be necessary to perform her past skilled work as an insurance clerk. (*See* ECF No. 5). Because the undersigned finds herein that the ALJ did not err, however, Claimant's arguments on these points are not relevant.

> documented chronic joint pain or stiffness AND abnormal motion, instability, or immobility of the affected joint AND anatomical abnormality of the affected joint noted on physical examination or imaging AND impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following: . . . an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

(Tr. 17).

Applying this standard to the record evidence, the ALJ pointed to medical records—with specific record citations—showing that medical examination findings and x-ray imaging revealed "mild degenerative changes in [Claimant's] hands bilaterally," but normal strength, sensation, and range of motion—with "no evidence [Claimant] is unable to independently initiate, sustain, and complete work-related activities involving fine and gross movements." *Id.* Further, the ALJ specifically noted in her discussion of the Claimant's RFC that Claimant reported "increased pain in her . . . hand" in the disability report, and testified that "[s]he cannot write long because of problems with her hands." (Tr. 19). The ALJ contrasted this evidence with the extensive activities of daily living in Claimant's function report. *Id.* Specifically, the Claimant "stated in her function report that she plays games on her phone, cooks, does chores, sews, prepares meals, drives, shops, and handles her finances . . . [and] reported no difficulty with personal care." *Id.* (citing Tr. 280-87).  Finally, the ALJ further discussed Claimant's hand-related symptoms in medical records from her rheumatologist, as well as the opinions of the state-agency physicians. (Tr. 21-24).

Based upon the ALJ's extensive consideration of the evidence, she found that Claimant's impairments—including Claimant's osteoarthritic impairments—could reasonably be expected to cause the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.* The ALJ provided for this finding in her RFC, stating that Claimant's combination of impairments, including osteoarthritis, "results in additional limitations consistent with the finding the claimant capable of sedentary exertion with postural and environmental limitations." (Tr. 24). This thorough, extensive discussion throughout the ALJ's written decision explains the evidentiary and logical basis for the ALJ's determination, and is well-supported by specific record citations. As such, Claimant's argument that "it is impossible to know, on this record, how, or even if, the ALJ considered [Claimant's] work-related limitations related to her bilateral osteoarthritis of the hands," (ECF No. 5 at 15-16), is simply not borne out by the record.

Moreover, Claimant does not highlight any specific findings from the medical records, or point to any inaccuracies in the ALJ's decision. In fact, she cites to only three pages of her medical records in support of her assertion that she was "diagnosed with osteoarthritis of both hands." (ECF No. 5 at 15 (citing Tr. 1035, 1045, 1385)). However, Claimant acknowledges that "the ALJ recognized this evidence." *Id.* Tellingly, Claimant fails both in her initial brief and in her reply brief to set forth *any* relevant authority, either within or without the Fourth Circuit, in support of her position that the ALJ erred under the circumstances. In fact, the sole basis for Claimant's challenge to the Commissioner's argument is her own stated disagreement that the ALJ's finding of severe osteoarthritis "did not" encompass a finding of severity with respect to Claimant's bilateral osteoarthritis of the hands. (ECF No. 9 at 4 ("It did not.")). Without any factual or legal support, Claimant's argument is patently insufficient to demonstrate error pursuant to the highly deferential standard of § 405(g) review.

The undersigned **FINDS** that the ALJ appropriately considered Claimant's bilateral osteoarthritis of the hands pursuant to the appropriate regulatory framework, and substantial evidence—more than a scintilla—supports the ALJ's determination. Again, while Claimant, and even the Court, may have reached a different determination, the ALJ's decision is supported by substantial evidence and Claimant has demonstrated no error. Accordingly, the undersigned respectfully recommends that Claimant's request for remand be **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 5), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's active docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit

Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   August 22, 2024

Dwane L. Tinsley
United States Magistrate Judge